**NATIONAL COMMUNITY REINVESTMENT COALITION, Plaintiff,**

v.

**NATIONAL CREDIT UNION ADMINISTRATION, and Dennis Dollar, Chairman, in his official capacity, Defendants.**

**No. CIV.A.02–00098(HHK).**

United States District Court, District of Columbia.

Nov. 6, 2003.

Jane C. Luxton, King & Spalding, Matthew Hirsch Clash–Drexler, Lawyers' Committee for Civil Rights Under Law, Washington, DC, for Plaintiff.

Vesper Mei, U.S. Department of Justice, Washington, DC, for Defendants.

## MEMORANDUM OPINION

KENNEDY, District Judge.

Plaintiff, National Community Reinvestment Coalition ("NCRC"), brings this action against defendants, National Credit Union Administration and its Chairman, Dennis Dollar, in his official capacity (collectively, "NCUA"), for failure to comply with the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.* NCRC alleges that NCUA violated the APA when it promulgated an interim final rule on December 20, 2001, that repealed a regulatory requirement promulgated on October 27, 2000. Presently before this court is defendants' motion to dismiss [# 3]. Upon consideration of defendants' motion to dismiss, the opposition thereto, and the record of this case, the court concludes that defendants' motion to dismiss must be granted.

## I. BACKGROUND INFORMATION

NCRC is a nonprofit trade association that seeks to promote economic justice in

the United States and to increase fair and equal access to credit, capital, and banking services to traditionally underserved populations. NCRC's members include individuals who, because of income or race, lack adequate access to credit products and financial services that traditional financial institutions offer, and the organizations that advocate for these individuals. NCRC's members also include credit unions. These individuals and member organizations rely on the availability of the products and services of credit unions. One of NCRC's primary activities is advocating for increased access to credit products and financial services in low-income and minority communities. NCRC accomplishes this goal by informing the public about whether financial institutions, such as credit unions, are complying with their obligation to provide credit products and services to the entire community.

NCUA is the federal agency charged with administering the Federal Credit Union Act, 12 U.S.C. § 1751 *et seq.* Credit unions are nonprofit cooperative associations organized for the purpose of promoting thrift among their members and providing a source of credit for productive purposes. 12 U.S.C. § 1752(1). A credit union is authorized to provide financial services only to persons or organization within a particular credit union's "field of membership." 12 U.S.C. § 1759. A community credit union services a membership field comprised of "[p]ersons or organizations within a well-defined local community, neighborhood, or rural district." *Id.* § 1759(b)(3). To receive a charter for a community credit union, or if an existing federal credit union wants to convert to a community charter, the applicant must submit business and marketing plans to NCUA. Organization and Operations of Federal Credit Unions, 63 Fed. Reg. 71,998, 72,037–38 (Dec. 30, 1998). The business plan incorporates the applicant's projections and assumptions regarding market conditions, member support, financial services, goals, and related information. *Id.* at 72,019–20. The marketing plan addresses how the relevant community will be served. *Id.* at 72,038.

On June 13, 2000, NCUA issued proposed amendments to the NCUA's charter and field of membership policies and provided a sixty-day comment period. Organization and Operations of Federal Credit Unions, 65 Fed.Reg. 37,065, 37,065 (June 13, 2000). The June 13, 2000 proposed amendments included a requirement that all community credit unions develop a Community Action Plan ("CAP"). The CAP would "supplement a community credit union's marketing plan by specifically addressing how the credit union plans to market its services to the entire community, including any underserved or low-income areas." Organization and Operations of Federal Credit Unions, 65 Fed.Reg. 64,-512, 64,517 (Oct. 27, 2000). If a credit union failed to follow its CAP, the NCUA could "initiate appropriate supervisory actions to require compliance." *Id.* NCUA received 423 comments opposing implementation of the CAP, and seven comments supporting the CAP. *Id.* On October 27, 2000, in response to the public comments, NCUA promulgated a final rule that modified the CAP proposal such that a credit union no longer had to provide a separate document,[1] but could "specifically

---

1. The final rule did not use the phrase "community action plan" or "CAP," but the parties and the credit union industry continue to use that term to refer to the requirement in the October 27, 2002 final rule. *See* Organization and Operations of Federal Credit Unions, 66 Fed.Reg. 65,625, 65,625 (Dec. 20, 2001); Def.'s Mot. to Dismiss, at 4 n. 4. This memorandum opinion, therefore, refers to the rule

address in its business plan, marketing plan or other appropriate separate documentation how the credit union plans to market its products and services to the entire community." *Id.* at 64,527; *see id.* at 64,518. The final regulation required that all credit unions have a plan in place by December 31, 2001. *Id.* at 64,519.

On December 20, 2001, NCUA promulgated an interim final rule that repealed the CAP; this repeal was effective immediately. Organization and Operations of Federal Credit Unions, 66 Fed.Reg. 65,-625, 65,625 (Dec. 20, 2001). The interim rule was not published thirty days prior to its effective date. NCUA stated that the immediate repeal of the CAP was "necessary and in the public interest because of the recent and sudden increase in credit union asset growth and the current uncertainty in the national economy." *Id.* at 65,626. NCUA determined that repeal of the CAP furthered the public interest by "removing a potentially costly and unnecessary regulatory burden and promotes the efficient use of agency resources and staff." *Id.* NCUA stated that the notice and public comment requirements of the APA were "impracticable, unnecessary, and contrary to the public interest." *Id.* NCUA provided a sixty-day period for public comment after the promulgation of the interim rule concerning "whether the community service plan requirement should be deleted from the Chartering Manual." *Id.* On January 18, 2002, NCRC submitted a response to NCUA's request for comments. NCRC informed NCUA that the repeal of the CAP violated the APA and that a post-hoc comment period

after the repeal was not an effective substitute.

NCUA received 428 comments in response to its request for comments about the interim final rule.[2] Of these comments, 415 supported the elimination of the CAP; twelve favored its reinstatement. Organization and Operations of Federal Credit Unions, 67 Fed.Reg. 20,-013, 20,014–15 (April 24, 2002). On April 24, 2002, after the sixty-day comment period, NCUA issued a final rule with an effective date of May 24, 2002 that repealed the CAP and adopted without change the interim final rule at issue in this case. *Id.* at 20,013.

NCRC alleges that NCUA violated the APA, 5 U.S.C. §§ 551(5), 553(b), (c), by failing to (1) publish general notice of the proposed repeal of the CAP in the Federal Register, and (2) provide an opportunity for the submission of public comments before the effective date of the repeal of the CAP. NCRC also alleges that NCUA violated the APA, 5 U.S.C. § 553(d), by failing to publish the proposed repeal thirty days before its effective date.

NCUA moves to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) on the grounds that NCRC lacks standing to pursue its claim. NCUA further contends that the issuance of the final rule on April 24, 2002 after notice and comment that adopts the interim rule at issue rendered NCRC's claims moot. NCRC also moves to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) because it had good cause to dispense with the APA requirements of notice and com-

---

using the term "community action plan" or "CAP."

**2.** NCUA noted that while it actually received 494 comment letters or email messages, it credited multiple comment letters from the

same credit union or source as a single comment, for a total of 428. Organization and Operations of Federal Credit Unions, 67 Fed. Reg. 20,013, 20,014 (April 24, 2002).

ment before the interim rule became effective.

## II. ANALYSIS

### A. Legal Standard for Motion to Dismiss

A motion to dismiss may be granted "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Martin v. Ezeagu*, 816 F.Supp. 20, 23 (D.D.C.1993) (internal quotation marks omitted); *see Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (stating that a complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"). In addition, the court must "construe the complaint in a light most favorable to [the] plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations." *In re United Mine Workers of Am. Employee Benefit Plans Litig.*, 854 F.Supp. 914, 915 (D.D.C.1994); *see Schuler v. United States*, 617 F.2d 605, 608 (D.C.Cir.1979) (stating that the court must give the plaintiff "the benefit of all inferences that can be derived from the facts alleged").

▮▮▮ In evaluating a Rule 12(b)(6) motion to dismiss, the court is limited to considering facts alleged in the complaint, any documents either attached to or incorporated in the complaint, matters of which the court may take judicial notice, *EEOC v. St. Francis Xavier Parochial School*, 117 F.3d 621, 624 (D.C.Cir.1997), and matters of public record, *Marshall County Health Care Authority v. Shalala*, 988 F.2d 1221, 1226 n. 6 (D.C.Cir.1993). In resolving a Rule 12(b)(1) motion for lack of jurisdiction, unlike motions brought pursuant to Rule 12(b)(6), courts are generally free to consider relevant materials outside the pleadings. *Land v. Dollar*, 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947) ("[W]hen a question of the District Court's jurisdiction is raised, either by a party or by the court on its own motion, ... the court may inquire, by affidavits or otherwise, into the facts as they exist."); *Artis v. Greenspan*, 223 F.Supp.2d 149, 152 (D.D.C.2002) ("A court may consider material outside of the pleadings in ruling on a motion to dismiss for lack of venue, personal jurisdiction or subject-matter jurisdiction.").

### B. Standing

▮▮▮ The court must address standing before it addresses the merits. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). The plaintiff bears the burden of establishing standing. *Id.* at 104, 118 S.Ct. 1003. Although the court must "accept as true all material allegations of the complaint," the plaintiff must "clearly ... allege facts demonstrating that [it] is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Warth v. Seldin*, 422 U.S. 490, 501, 518, 95 S.Ct. 2197, 45 L.Ed.2d 343. The plaintiff need only allege facts that demonstrate " 'a realistic danger of ... sustaining a direct injury.' " *Bristol–Myers Squibb Co. v. Shalala*, 91 F.3d 1493, 1497 (D.C.Cir.1996) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)). "[G]eneral factual allegations of injury resulting from the defendant's conduct may suffice [to establish standing], for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.' " *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497

U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)).

■ The three constitutional components of standing are:

First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) "actual or imminent, not 'conjectural' or 'hypothetical.' " Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant. . . ." Third, it must be "likely" as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. at 560–61, 112 S.Ct. 2130 (internal citations omitted).

NCRC claims that it has been injured because "it is deprived of important and valuable information provided under the repealed rule." Compl. ¶¶ 36, 41. NCRC asserts that "[t]he public availability of the information required to be maintained under the [CAP] is essential to NCRC's efforts to achieve its mission of increasing access to capital for traditionally underserved communities." *Id.* ¶ 14. Without this information, NCRC alleges that its ability to "analyze lending data and to render accurate advice to its members regarding the availability of credit products and financial services will be severely impaired." [3] *Id.* ¶¶ 36, 41. NCRC alleges that NCUA's repeal of the community service plan requirement results made this information unobtainable because it was either unavailable or because the effort needed to obtain the information would significantly drain NCRC's resources. In

addition, NCRC alleges that "the repeal of the community service plan requirement threatens the financial health and security of credit unions and thus injures those credit union members who rely on the availability of such products and services." *Id.* NCRC maintains that if NCUA had complied with the notice and comment requirements, NCRC and its member organizations would have been able to submit comments opposing the repeal of the CAP after seeing the CAP information, which would have impacted the scope and nature of public comment on the proposed rule. *Id.* ¶ 28.

NCUA argues that because the information required to be maintained under the CAP would not have been publicly available, NCRC sustained no injury. As a result, NCUA maintains that NCRC's alleged is injury is not traceable to NCUA's promulgation of the interim final rule, and that the alleged injury would not be redressable if this court rendered a decision in favor of NCRC.

### 1. Public Availability of Information

NCUA maintains that the CAP information credit unions would be required to provide to NCUA would not be available to the public. NCUA's regulations exempt certain types of records from public disclosure. 12 C.F.R. § 792.11. These records include "[r]ecords which contain trade secrets and commercial or financial information which relate to the business, personal or financial affairs of any person or organization, are furnished to NCUA, and are confidential or privileged." 12 C.F.R. § 792.11(a)(4). In addition, records "[c]ontained in or related to examination, operat-

---

**3.** While NCRC uses this language to describe another type of injury, the lack of public availability of information is at the heart of the alleged injury to its ability to analyze data and

provide advice. Thus, the court will consider two alleged injuries: (1) lack of public availability of information, and (2) a threat to the financial health and security of credit unions.

ing or condition reports prepared by, or on behalf of, or for the use of NCUA or any agency responsible for the regulation or supervision of financial institutions," are also exempt. 12 C.F.R. § 792.11(a)(8). These NCUA regulations parallel exemptions 4 and 8 of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b)(4), (8).

 FOIA contains a presumption that records in the possession of federal agencies should be accessible to the public. *Chrysler Corp. v. Brown,* 441 U.S. 281, 290, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979); *Dep't of Air Force v. Rose,* 425 U.S. 352, 361, 96 S.Ct. 1592, 48 L.Ed.2d 11; *Ctr. for Auto Safety v. Nat'l Hwy. Traffic Safety Admin.,* 244 F.3d 144, 151 (D.C.Cir.2001). "In litigation seeking the release of information under FOIA, 'the agency has the burden of showing that requested information comes within a FOIA exemption.'" *Pub. Citizen Health Research Group v. FDA,* 185 F.3d 898, 904 (D.C.Cir.1999) (quoting *Niagara Mohawk Power Corp. v. Dep't of Energy,* 169 F.3d 16, 18 (D.C.Cir. 1999)).

NCRC argues that NCUA's reliance on FOIA exemptions is not properly before the court because NCUA has not presented the type of detailed record upon which judicial determinations under FOIA must be made. NCRC relies on the fact that NCUA has not submitted "an index to the court which must adequately describe the withheld information and explain the relevance of each exemption," *Judicial Watch, Inc. v. Export–Import Bank,* 108 F.Supp.2d 19, 25 (D.D.C.2000); *see Vaughn v. Rosen,* 484 F.2d 820, 827 (D.C.Cir.1973), or any affidavits or declarations describing the withheld material in detail. *Ctr. for Pub. Integrity v. Dep't of Energy,* 191 F.Supp.2d 187, 190–92 (D.D.C.2002). Indeed, NCUA cannot offer such evidence because the repeal of the CAP requirement prevented such evidence from coming into existence. The court finds, however, that the unknown nature of the specific content of the CAP information is not fatal to NCUA's argument based on the FOIA exemptions. The CAP information consists of business and marketing plans, which NCUA routinely withholds under FOIA exemptions 4 and 8. *See* Ex. 1 to Defs.' Mot. to Dismiss.

### a. Exemption 4

 Exemption 4 of FOIA exempts the disclosure of information that is "(a) commercial or financial, (b) obtained from a person, and (c) privileged or confidential." *Nat'l Parks & Conservation Ass'n v. Morton,* 498 F.2d 765, 766 (D.C.Cir. 1974); *see* 5 U.S.C. § 552(b)(4). First, NCUA argues that the CAP information would be both commercial and financial because the information would address the credit union's plans to market its products and services to the entire community. Organization and Operations of Federal Credit Unions, 65 Fed.Reg. at 64,527. The terms "commercial" and "financial" are to be given their ordinary meanings. *Pub. Citizen Health Research Group v. FDA,* 704 F.2d 1280, 1290 (D.C.Cir.1983). NCUA asserts that the credit unions would have both commercial and financial interests in their planned marketing methods. NCRC does not dispute that the credit unions would have commercial and financial interests in this information.

Second, there is no question that the information would be obtained from a "person" because a credit union applicant meets the definition of a "person" under FOIA. 5 U.S.C. § 551(2) (defining "person" to include "an individual, partnership, corporation, association, or public or private organization other than an agency").

 Finally, commercial or financial information is confidential if it is "likely to

have either of the following effects: (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." *Nat'l Parks*, 498 F.2d at 770. The test announced in *National Parks* applies only to cases "in which a FOIA request is made for financial or commercial information a person was obliged to furnish the Government." *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 880 (D.C.Cir.1992). This is the situation here because the CAP information is information that a person would have been required to submit to the government to apply for a community charter. NCUA does not claim that the disclosure of the information would harm the government's ability to obtain such information in the future; rather, NCUA argues that the disclosure of the information would cause substantial competitive harm to the credit unions.

■ "[T]o show the likelihood of substantial competitive harm, it is not necessary to show actual competitive harm. Actual competition and the likelihood of substantial competitive injury is all that need be shown." *Gulf & W. Indus., Inc. v. United States*, 615 F.2d 527, 530 (D.C.Cir.1979). NCRC concedes that credit unions face actual competition. Pl.'s Opp'n at 13.

■ To determine whether disclosure of information would likely cause substantial competitive injury, the court "need only exercise its judgment in view of the nature of the material sought and the competitive circumstances in which the [competitors] do business." *Nat'l Parks & Conservation Ass'n v. Kleppe*, 547 F.2d

673, 683 (D.C.Cir.1976). The information to be submitted includes information on "ATMs, ... current or future customized programs to assist community residents such as credit counseling and budgeting, and current or future service facility locations." Organization and Operations of Federal Credit Unions, 65 Fed.Reg. at 64,-527. Thus, NCUA contends that public disclosure of such information would likely cause substantial injury because allowing competitors to see a credit union's proposed community assistance programs, plans for future expansion, or plans for marketing itself in the community generally could cause competitive injury. Therefore, NCUA routinely withholds business and marketing plans, and budget and financial projections for credit unions under exemption 4. *See* Ex. 1 to Defs.' Mot. to Dismiss.

■ NCRC responds that much of the CAP information is not confidential because it is available through other sources. Public availability of information defeats an argument that the disclosure of the information would likely cause competitive harm. *Worthington Compressors, Inc. v. Costle*, 662 F.2d 45, 51 (D.C.Cir.1981); *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1154 (D.C.Cir.1987). NCRC argues that comment letters to NCUA, plans released to the general public, and financial data posted on NCUA's web site show that credit unions do not consider such information confidential. *See* Ex. A (Myers Aff. ¶ 3). NCRC also relies on the disclosure of information under the Community Reinvestment Act of 1977 ("CRA"), 12 U.S.C. §§ 2901–2905; 12 C.F.R. § 25.27, to support its argument that the CAP information is not confidential.[4]

4. Under the CRA, financial institutions can elect to submit a Strategic Plan to its regulating agencies in lieu of a regular examination.

12 C.F.R. § 25.27. This Strategic Plan would contain information similar to the CAP. However, NCRC's reliance on the CRA Strategic

NCRC also contends that NCUA must conclusively show that disclosure of every portion of the CAP information would present a likelihood of substantial competitive injury to complying credit unions. NCRC argues that NCUA offers only conclusory and generalized assertions of the level of competitive harm, which are insufficient to sustain the burden of nondisclosure under FOIA. *See Nat'l Parks & Conservation Ass'n v. Kleppe,* 547 F.2d 673, 679 (D.C.Cir.1976). NCRC maintains that because credit unions have voluntarily disclosed to the public some of the CAP information, NCUA cannot show that disclosure of all CAP information would cause substantial competitive harm.

 NCRC's position cannot be sustained. NCRC correctly argues that publicly available CAP information would not be confidential. This argument, however, undermines NCRC's position because the public availability of such information also means that NCRC did not suffer injury from the repeal of the CAP requirement. NCRC's assertion that no substantial competitive harm would occur if *all* CAP information were disclosed does not follow from the fact that *some* of the CAP information is publicly disclosed through other means. The portions of the CAP information that are not already publicly disclosed are likely those portions that would cause competitive harm. Business and marketing plans by their nature usually contain information that would cause competitive harm if disclosed. The court concludes that disclosure of those portions of the CAP information that are not already publicly disclosed, in light of the actual competition credit unions face, would likely result in substantial competitive harm, and are therefore

confidential. Accordingly, the court concludes that exemption 4 of FOIA would apply.

#### b. Exemption 8

 NCUA also argues that exemption 8 of FOIA protects the CAP information from disclosure. Exemption 8 protects information "contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions." 5 U.S.C. § 552(b)(8). A credit union is included in the definition of "financial institution." *See Pub. Citizen v. Farm Credit Admin.,* 938 F.2d 290, 292 (D.C.Cir. 1991). NCUA is the agency responsible for the regulation of such financial institutions, and regularly examines federal credit unions after they have received their charter. Organization and Operations of Federal Credit Unions, 63 Fed.Reg. at 72,-021. Thus, to the extent the CAP information would be submitted to NCUA as part of an application or in connection with an examination of a credit union after the initial charter was received, such information is "contained in or related to . . . reports prepared by . . . or for the use of" NCUA. 5 U.S.C. § 552(b)(8).

 There are two purposes of exemption 8. One is to safeguard public confidence in credit unions, which could be undermined by candid evaluations of financial institutions, resulting in "unwarranted runs on banks." *Pub. Citizen v. Farm Credit Admin.,* 938 F.2d 290, 291 (D.C.Cir. 1991) (internal quotation marks and citation omitted). The other is to ensure that

Plan is inapposite because submission of a Strategic Plan is voluntarily provided by financial institutions, not a requirement imposed on all credit unions. Moreover, the information in the Strategic Plan and the CAP

would not be identical. Organization and Operations of Federal Credit Unions, 65 Fed. Reg. at 64,517 ("CAP is not the same as the [CRA], nor was it intended to be 'like CRA.' ").

credit unions continue to cooperate with NCUA without fear that their confidential information will be disclosed. *Consumers Union of U.S., Inc. v. Heimann,* 589 F.2d 531, 534 (D.C.Cir.1978). The court finds that the second purpose of exemption 8 would obviously be implicated if all the CAP information were disclosed, and therefore exemption 8 would apply to protect those portions of the CAP information not already disclosed from disclosure.[5]

#### c. Segregability

NCRC then argues that even if some of the CAP information were confidential, other portions would not be exempt from disclosure. "Any reasonably segregable portion" of a document is to be released after the nondisclosable portions are deleted and segregated from the other portions. 5 U.S.C. § 552(b); *Trans–Pacific Policing Agreement v. U.S. Customs Serv.,* 177 F.3d 1022, 1026–27 (D.C.Cir.1999); *Oglesby v. U.S. Dep't of the Army,* 79 F.3d 1172, 1176 (D.C.Cir.1996). NCRC maintains that the CAP information would not completely be subject to FOIA exemptions, and therefore they have suffered injury because some portion of the information would be disclosed.

NCRC correctly argues that not all the CAP information may be covered by exemption 4 or exemption 8. However, those portions of the CAP information that would be outside the scope of the exemptions are already publicly disclosed. The court concluded in discussing exemption 4 that disclosure of any CAP information not already publicly available would likely cause substantial competitive harm if disclosed. Similarly, the court concluded in discussing exemption 8 that disclosure of any CAP information not already available would be contrary to the second purpose of exemption 8, which is to ensure that credit unions continue to cooperate with NCUA without fear of disclosure of confidential information. Therefore, there is no CAP information that would be segregable but not already disclosed.

■ Accordingly, the court concludes that because the CAP requirement information would either already be publicly available, or covered by a FOIA exemption, NCRC has not sustained an injury from the repeal of the CAP on this ground. For the same reason, NCRC's alleged injury is not fairly traceable to NCUA's actions, and would not be redressable by a favorable decision from this court.

#### 2. Threat to the Safety and Soundness of Credit Unions

■ NCRC also claims it has standing because the repeal of the CAP "threatens the financial health and security of credit unions and thus injures those credit union members who rely on the availability of

5. In addition, NCRC contends that exemption 8 would not apply to all CAP information because much of the information is already publicly available. Some of the CAP information is regularly disclosed to various organization to obtain funding to perform community development work. Ex. A (Myers Aff. ¶ 10). As discussed above, the fact that some CAP information is publicly disclosed through other means does not mean that an exemption is inapplicable to other portions of the CAP information.

NCRC also argues that exemption 8 does not apply because the exemption does not apply to the protection of "purely factual material," relying on *In re Subpoena Served Upon Comptroller of Currency, Secretary of Board of Governors of Federal Reserve System,* 967 F.2d 630, 634 (D.C.Cir.1992). NCRC contends that information about how financial institutions plan to market services to the community is factual. NCRC's reliance on *In re Subpoena* is inapposite because it did not deal with exemption 8 of FOIA, but with a "bank examination privilege." *Id.* Furthermore, the court notes that marketing information is usually not purely factual.

such products and services." Compl. ¶¶ 36, 41. NCRC contends that without a CAP in place, a credit union faces the risk of competition from other financial institutions, the threat of potential litigation if it is found to be denying services or credit opportunities on impermissible grounds, and harm to the credit union's reputation based on a perception that it does not wish to serve its entire field of membership. *See* Ex. M (Berenbaum Aff. ¶ 4). The court finds that the potential harm NCRC alleges is merely speculative and not concrete. A credit union would face competition from other financial institutions even if a CAP were required. The CAP would not protect a credit union from potential litigation. If a credit union believed that it was being perceived as unwilling to serve the entire community, it could voluntarily make disclosures similar to those in the CAP to improve its reputation. Moreover, the CAP requirement was not instituted because NCUA believed that community credit unions were not planning on serving their entire community. *See* Organization and Operations of Federal Credit Unions, 65 Fed.Reg. at 64,517 (stating that "many community credit unions already have adopted plans and offer products and services designed to serve the entire community"); Organization and Operations of Federal Credit Unions, 66 Fed.Reg. at 65,625 (recognizing that "there was no tangible evidence that credit unions were not planning on serving their entire community"). Therefore, the court concludes that NCRC's alleged injury based on the threat to the financial health and security of credit unions is insufficient to establish standing.

Accordingly, because NCRC lacks standing to bring its claims, defendants' motion to dismiss must be granted.

### C. Mootness

■■■ Although it need not reach the threshold consideration of mootness that NCUA raised because NCRC lacks standing, the court finds that mootness also provides a basis for dismissal.

■■■■ Although the interim rule was subject to APA notice and comment requirements, *Tenn. Gas Pipeline Co. v. FERC*, 969 F.2d 1141, 1145 (D.C.Cir.1992) (citing *Council of S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 582 (D.C.Cir. 1981)), in some situations an agency can engage in new rulemaking to supercede defective rulemaking. *Ctr. for Sci. in the Pub. Interest v. Regan*, 727 F.2d 1161, 1164 (D.C.Cir.1984); *Natural Res. Def. Council, Inc. v. U.S. Nuclear Regulatory Comm'n*, 680 F.2d 810, 812 (D.C.Cir.1982); *New Mexico v. Heckler*, 1984 WL 48799, *3 (D.D.C. Mar.30, 1984). While an opportunity for comment after the promulgation of a rule is not a substitute for notice and comment before the issuance of a rule, "adequate later notice" may cure a failure to comply with 5 U.S.C. § 553 if "the agency's mind remain[ed] open enough at the later stage." *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1323 (D.C.Cir.1988); *see Universal Health Servs. of McAllen, Inc. v. Sullivan*, 770 F.Supp. 704, 721 (D.D.C.1991). The instant case is distinguishable from cases in which an agency provided an opportunity to submit comments after a rule was promulgated, but did not actually consider the comments received. *See, e.g., Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 609–10, 621 (D.C.Cir.1980); *Nat'l Treasury Employees Union v. Newman*, 768 F.Supp. 8, 12–13 (D.D.C.1991); *New Jersey v. EPA*, 626 F.2d 1038, 1049–50 (D.C.Cir.1980); *Nat'l Tour Brokers Ass'n v. United States*, 591 F.2d 896, 901–02 (D.C.Cir.1978). NCUA considered two rounds of public comment before it issued the April 24, 2002 final rule repealing the

138

CAP and adopting the interim final rule without change: one round before it initially promulgated the CAP requirement on October 27, 2002, and another round after it promulgated the interim rule repealing the CAP. The overwhelming majority of the comments in both rounds opposed the CAP. NCUA's discussion of the 428 comments received after the interim rule demonstrates that the agency had not closed its mind before promulgating the final rule. Organization and Operations of Federal Credit Unions, 67 Fed. Reg. at 20,014–15. Accordingly, the court concludes that the issuance of the final rule repealing the CAP renders plaintiff's claims moot.

Because the court concludes that NCRC lacks standing and that NCRC's claims are moot, the court need not discuss NCUA's motion to dismiss on the grounds that it had good cause to dispense with notice and comment requirements.

### III. CONCLUSION

For the forgoing reasons, the court concludes that defendants' motion to dismiss must be granted. An appropriate order accompanies this memorandum opinion.

### ORDER AND JUDGMENT

Pursuant to FED. R. CIV. P. 58 and for the reasons stated by the court in its memorandum opinion docketed this same day, it is this 6th day of November, 2003, hereby

**ORDERED** and **ADJUDGED** that the complaint in this case is **DISMISSED**.