**In re SUBPOENA SERVED UPON the COMPTROLLER OF the CURRENCY, AND the SECRETARY OF the BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM.**

Nos. 91–5427, 91–5428.

United States Court of Appeals, District of Columbia Circuit.

Argued March 17, 1992.

Decided June 26, 1992.

Peter R. Maier, Atty., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., and Anthony J. Steinmeyer, were on the brief, for appellants in both cases.

Robert M. Kornreich, with whom Robert J. Berg, was on the brief, for appellees in both cases. Jerry S. Cohen also entered an appearance for appellees.

S. Michael Levin, Scott B. Schreiber, Roger P. Fendrich, and Andrew T. Karron, were on the joint brief, for amici curiae Fleet/Norstar Financial Group Inc., The American Bankers Ass'n, The Ass'n of Bank Holding Companies, and The New York Clearing House Ass'n. Patricia A. Dean, John J. Gill, Michael F. Crotty, and John L. Warden, also entered appearances for amici curiae.

Before RUTH BADER GINSBURG, BUCKLEY, and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

The plaintiffs-appellees filed a shareholders' class action and a derivative suit against a bank holding company (BHC). They subpoenaed from the appellants, the Office of the Comptroller of the Currency (OCC) and the Secretary of the Board of Governors of the Federal Reserve System (Board), (1) certain bank examination reports prepared by those agencies and provided to the BHC subject to a regulation requiring that they be kept confidential, and (2) the bank examiners' notes and memoranda of interviews with bank personnel. The two agencies objected to production of the reports, claiming deliberative process and bank examination privileges from disclosure. The district court ordered the agencies to give the plaintiffs copies of (1) such documents as, in the course of their supervisory activities, they had given to the BHC, and (2) the factual portions of their interview notes and memoranda.

We affirm the district court's order insofar as it requires the agencies to produce the factual portions of their interview notes

and memoranda. We hold that the district court erred, however, insofar as it relied in any way upon the agencies' having given the remaining documents to the BHC, and in failing clearly to weigh the legal considerations relevant to application of the bank examination privilege. Therefore, we remand that portion of the case to the district court for further proceedings.

## I. BACKGROUND

The plaintiffs sued Fleet/Norstar Financial Group, Inc., a multi-bank holding company, and some of its officers in the United States District Court for the District of Rhode Island. The plaintiffs allege that between September 11, 1989 and April 3, 1990 the defendants, in order to inflate the price of Fleet common stock, conspired to issue a series of false and misleading statements about Fleet's financial condition, in violation of the Securities and Exchange Act of 1934 and of the common law against negligent misrepresentation.

Specifically, the plaintiffs allege that Fleet officers knowingly or recklessly made unduly optimistic statements about Fleet's nonperforming assets and reserve for loan losses. In this vein, they claim that:

> By the summer of 1989, defendant[s] ... were aware that the New England real estate market was in a major downturn and that this real estate downturn would be prolonged and severe. Nevertheless, [they] continued to repeat [their] theme of Fleet/Norstar's insulation from the New England market's woes.

According to the plaintiffs, Fleet knew or should have known that its loan classification and appraisal policies were inconsistent with applicable regulatory standards, that the BHC "would be subject to a comprehensive, definitive, and coordinated examination by bank regulators in early 1990," and therefore that the regulators would require it to increase both its accounting for nonperforming assets and its loan loss reserve. They allege further that for the first quarter of 1990, Fleet reported more than twice as much in nonperforming loans and leases than in the previous quar-

ter, and took a large write off; and in the second quarter of 1990, Fleet again reported a significant increase in nonperforming assets.

The plaintiffs sought to discover from Fleet all documents relating to its investigation or examination by any federal bank regulatory agency pertaining to the period from September 11, 1989 to April 3, 1990. They specifically asked Fleet for all (1) bank examination reports prepared by the appellant agencies, (2) cease-and-desist orders received from the agencies, (3) agency documents indicating a determination that Fleet had engaged in "unsafe or unsound" practices, (4) correspondence between the regulators and Fleet concerning its financial condition, (5) agency documents adversely classifying Fleet assets, (6) agency reports mentioning Fleet that were prepared for congressional hearings or investigations, and (7) all of Fleet's Reports of Condition and Income. According to the plaintiffs, these documents represent "a unique and objective contemporaneous chronicle of the true financial status of Fleet/Norstar and defendants' knowledge, and are directly related to the charges that defendants misleadingly described the bank's financial condition in violation of the federal securities laws."

Fleet refused to produce any such documents on the ground that federal law prohibits the disclosure of confidential supervisory information without the authorization of the relevant bank regulatory agency. See 12 C.F.R. §§ 4.15–4.19 (OCC); §§ 261.11–261.14 (Board). When the district court denied the plaintiffs' motion to compel production, the plaintiffs asked the OCC and the Board directly for access to the records. The agencies refused, asserting that the records are protected by the deliberative process and bank examination privileges. The plaintiffs then served the agencies with subpoenas for the disputed documents, and ultimately brought this enforcement action in the United States District Court for the District of Columbia.

The district court granted in part and denied in part plaintiffs' motion. Stating that it "wouldn't turn these over if [the

agencies] didn't give it [sic] to the banks," the court found that the "plaintiffs' demonstrated need to use the documents which the OCC [or the Board] provided to Fleet/Norstar ... outweighs [the agencies'] interest in preserving the confidentiality of such documents." Accordingly, the court ordered production of all the requested bank examination reports and related communications between the agencies and Fleet relating to the period from September 11, 1989 to April 3, 1990 "insofar as those documents were made available to Fleet/Norstar by the OCC [and the Board]." In addition, the court ordered the agencies to turn over the factual portions of certain intra-agency documents they had never shared with Fleet, namely memoranda and notes "detailing interviews held by OCC [or Board] examiners with Fleet/Norstar employees or directors."

The Government appealed. *See In re Multi–Piece Rim Products Liability Litig.*, 653 F.2d 671, 676 (D.C.Cir.1981) ("Since the litigation was in the district court solely for purposes of the discovery motion, the court's disposition of that motion [is] an appealable final judgment"). We stayed the order of the district court pending resolution of the appeal.

## II. ANALYSIS

■ Ordinarily, we review only for arbitrariness a district court ruling on a subpoena for the production of documentary evidence. *See United States v. Nixon*, 418 U.S. 683, 702, 94 S.Ct. 3090, 3104–05, 41 L.Ed.2d 1039 (1974). A discovery order is not entitled to deference, however, if it rests upon a misapprehension of the relevant legal standard or is unsupported by the record. *See In re Sealed Case (Government Records)*, 950 F.2d 736, 738 (D.C.Cir.1991).

The agencies argue that the district court erred as a matter of law insofar as it ordered production of the disputed documents simply "because [the] OCC and the Board had provided them to Fleet/Norstar ... as part of the regulatory process." The agencies insist that they do not waive the qualified privilege for bank supervisory

information merely by sharing it with the bank to which it pertains. The district court's contrary holding, they claim, "reflects a fundamental misconception about the process of bank regulation." Alternatively, the agencies contend that in deciding to order production of the privileged documents the district court improperly balanced the relevant factors.

In opposition to the agencies, the plaintiffs argue that the bank examination reports are "essentially factual in purpose and nature." Therefore, they claim, being relevant the reports are discoverable pursuant to Fed.R.Civ.P. 26, in the discretion of the district court, and "a balancing test was not required."

Before resolving the issues thus presented, we note by way of background that the courts have long recognized that the report of a bank examiner is protected by a qualified privilege. *See, e.g., Bank of America Nat'l Trust & Sav. Ass'n v. Douglas*, 105 F.2d 100, 104–06 (D.C.Cir.1939) ("by unbroken custom reports of bank examiners have been regarded as privileged"); *In re Franklin Nat'l Bank Securities Litig.*, 478 F.Supp. 577, 580–82 (E.D.N.Y.1979). That privilege has been referred to variously as an aspect of the privilege for "official information," *see Delozier v. First Nat'l Bank of Gatlinburg*, 113 F.R.D. 522, 525 (E.D.Tenn.1986), or "intragovernmental opinions," *see Lundy v. Interfirst, Corp.*, 105 F.R.D. 499, 502 (D.D.C.1985), or even of the "deliberative process privilege." *See Seafirst Corp. v. Jenkins*, 644 F.Supp. 1160, 1163 (W.D.Wash.1986).

However denominated, the bank examination privilege is firmly rooted in practical necessity. Bank safety and soundness supervision is an iterative process of comment by the regulators and response by the bank. The success of the supervision therefore depends vitally upon the quality of communication between the regulated banking firm and the bank regulatory agency. This relationship is both extensive and informal. It is extensive in that bank examiners concern themselves with all manner of a bank's affairs: Not only the classification of assets and the review of

financial transactions, but also the adequacy of security systems and of internal reporting requirements, and even the quality of managerial personnel are of concern to the examiners. *See, e.g.,* OFFICE OF THE COMPTROLLER OF THE CURRENCY, COMPTROLLER'S HANDBOOK FOR NATIONAL BANK EXAMINERS § 1.1, at 1–3 (1990); BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, COMMERCIAL BANK EXAMINATION MANUAL § 1.1 at 1–2 (1988).

The supervisory relationship is informal in the sense that it calls for adjustment, not adjudication. In the process of comment and response, the bank may agree to change some aspect of its operation or accounting; alternatively, if the bank and the examiners reach impasse, then their dispute may be elevated for resolution at higher levels within the bank regulatory agency. It is the very rare dispute, however, that culminates in any formal action, such as a cease and desist order. *See, e.g.,* Office of the Comptroller of the Currency, 11 QUARTERLY J. 3, 21 (1992) (in 1991 OCC issued 83 cease and desist orders in course of supervising approximately 3800 national banks); BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, 78TH ANNUAL REPORT 208 (1991) (in 1991 Board began 198 formal enforcement cases while supervising approximately 6500 BHCs that control about 8500 commercial banks).

Because bank supervision is relatively informal and more or less continuous, so too must be the flow of communication between the bank and the regulatory agency. Bank management must be open and forthcoming in response to the inquiries of bank examiners, and the examiners must in turn be frank in expressing their concerns about the bank. These conditions simply could not be met as well if communications between the bank and its regulators were not privileged. *See Franklin Nat'l Bank,* 478 F.Supp. at 586; *United States v. Provident Nat'l Bank,* 41 F.R.D. 209, 210 (E.D.Pa.1966); *see also Wolfe v. Dep't of Health and Human Servs.,* 839 F.2d 768, 773 (D.C.Cir.1988) ("[T]he quality of administrative decision-making would be seriously undermined if agencies were forced to operate in a fishbowl").

■ Nonetheless, the discovery of bank examination information is not absolutely precluded. The bank examination privilege, like the deliberative process privilege, shields from discovery only agency opinions or recommendations; it does not protect purely factual material. *See Environmental Protection Agency v. Mink,* 410 U.S. 73, 90, 93 S.Ct. 827, 837, 35 L.Ed.2d 119 (1973); *Franklin Nat'l Bank,* 478 F.Supp. at 581. Even when asserted to protect deliberative material, the privilege may be overridden where necessary to promote "the paramount interest of the Government in having justice done between litigants," *Northrop Corp. v. McDonnell Douglas Corp.,* 751 F.2d 395, 407 (D.C.Cir. 1984) (quoting *Westinghouse Elec. Corp. v. City of Burlington, Vt.,* 351 F.2d 762, 767 (D.C.Cir.1965)); or to "shed light on alleged government malfeasance," *Franklin Nat'l Bank,* 478 F.Supp. at 582; or in other circumstances "when the public's interest in effective government would be furthered by disclosure." *Id.* When the privilege is overridden for good cause, it is appropriate for the district court to consider the possibilities of redaction and a protective order to minimize any harm that might otherwise result from compelling disclosure of bank examination information.

Because the bank examination privilege is not absolute, each time it is asserted the district court must undertake a "fresh balancing of the competing interests," which will frequently require it to examine the disputed documents *in camera. Id.* In weighing the competing interests, we think that a court must consider at least the following factors (as enumerated by Judge Weinstein):

> (i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the 'seriousness' of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable.

*Id.* at 583 (citations omitted).

■ Returning to the case before us, we begin with the plaintiffs' claim that the

materials they seek are "essentially factual." First, the district court expressly found that certain portions of OCC and Board interview notes and memoranda are indeed factual, and therefore ordered the agencies to produce them. The agencies point to nothing in the record to call that finding into question. Accordingly, we affirm the portion of the district court order that requires production of the agencies' interview notes and memoranda.

■ Second, although the district court did not expressly find that the bank examination reports and related materials are deliberative in nature, the court necessarily found as much by implication; otherwise, it would not have had occasion to apply the bank examination privilege and to conclude that it had been waived on the facts of this case. In the absence of record evidence to the contrary, and in light of the posture of this case, we shall presume that the contested bank examination information consists at least in part of opinions and recommendations. We note, however, that some district courts, after viewing bank examination reports *in camera,* have found at least portions of them to be primarily factual. *See, e.g., Seafirst,* 644 F.Supp. at 1163; *Franklin Nat'l Bank,* 478 F.Supp. at 583–86.

Turning to the agencies' arguments, we see from the order and the transcript of the hearing that the district court does seem indeed to have ordered production of the bank examination reports, as the agencies claim, essentially because the regulators had shared them with the BHC. At the hearing the court, having rejected the agencies' argument that to allow discovery of bank examination reports and related documents would unduly burden them with discovery requests, offered the following suggestion:

[D]on't send them to the banks, then you don't have a problem. *I wouldn't turn these over if you didn't give it [sic] to the banks.* Banks have it. See, that's the thing that is terribly troublesome to me. The banks are given this information. I'm not ordering anything turned over here other than what the banks

already have, except for some of these notations … because they were factual and they were memos or notes of interview[s].

But, you know, you have a very simple thing. Don't send these documents to the bank. It's in the bank's records. Everybody has it at the bank, except the shareholders.

Transcript, Nov. 19, 1991, at 38–39 (emphasis supplied).

We do not think that sharing a bank examination report or other supervisory information with the subject depository institution can reasonably be thought to bear upon the continuing need for the privilege. The provision of such information to the depository institution is a fundamental part of the regulatory process. "The [bank examination] report is directed to the bank so that it may respond to the criticisms set out and specify the steps it will take to correct the problems and violations noted in the report." Declaration and Claim of Privilege of Robert L. Clarke, Comptroller of the Currency ¶ 15; *see also* Declaration of David W. Mullins, Jr., Vice Chairman of the Board of Governors of the Federal Reserve System ¶ 18–20.

■ To hold that the privilege is waived or even weakened merely because the regulator provides the report to the bank would quickly render the privilege a dead letter. Therefore, to the extent that the district court relied upon the agencies' having "sen[t] these documents to the bank"—and it seemingly would not have ordered production but for that—it erred as a matter of law.

While it is clear that in ordering production of the bank examination reports and related communications the district court considered an improper factor, it is not clear from the record whether the court also considered all of the factors that are relevant. To be sure, the district court order does use the language of balancing in concluding that the "plaintiffs' demonstrated need to use the documents which the OCC [and the Board] provided to Fleet/Norstar outweighs the [agencies'] interest in preserving the confidentiality of

such documents." Neither the order nor the rather unfocused hearing that preceded it indicates with any clarity, however, the factors that persuaded the court to this conclusion. Accordingly, a remand is necessary for the district court in the first instance to balance the pertinent interests at stake in this discovery dispute.

### III. CONCLUSION

The district court erred in ordering the production of privileged bank examination information because the bank regulatory agencies had made it available to the bank, and in failing to consider and balance the factors relevant to overriding the privilege for such documents. Therefore, the order of the district court is affirmed in part and vacated in part and this matter is remanded to the district court for further proceedings consistent with this opinion.

*So ordered.*