145 F.3d 1422
 330 U.S.App.D.C. 352, 41 Fed.R.Serv.3d 306,
32 Bankr.Ct.Dec. 998,
10 Fourth Cir. & D.C. Bankr. 429
 In re SUBPOENA DUCES TECUM SERVED ON THE OFFICE OF THE
COMPTROLLER OF THE CURRENCY.
 Nos. 97-5228, 97-5229.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 4, 1998.
Decided June 26, 1998.
 
 Appeals from the United States District Court for the District of Columbia (Nos. 94ms00329, 95ms00006).
 Thomas R. Kline argued the cause for appellant, with whom Thomas E. Starnes and Scott A. Richie were on the briefs.
 Larry J. Stein, Attorney, United States Department of Treasury, argued the cause for appellee Comptroller of the Currency, with whom L. Robert Griffin, Director, and Rosa M. Koppel, Attorney, were on the brief. Robert B. Serino, Deputy Chief Counsel, entered an appearance.
 Stephen H. Meyer, Senior Attorney, argued the cause for appellee Board of Governors of the Federal Reserve System, with whom James V. Mattingly, Jr., General Counsel, Richard M. Ashton, Associate General Counsel, Katherine H. Wheatley, Assistant General Counsel, and Karen A. Appelbaum, Senior Attorney, were on the brief.
 Before: EDWARDS, Chief Judge, SILBERMAN and SENTELLE, Circuit Judges.
 SILBERMAN, Circuit Judge:
 
 
 1
 The Trustee in Bankruptcy for the Bank of New England Corporation appeals from the district court's refusal to enforce subpoenas duces tecum against the Federal Reserve Board and the Comptroller of the Currency. We reverse, holding that the deliberative process privilege does not protect these documents, and remand to the district court.
 
 I.
 
 2
 The Bank of New England Corporation and its subsidiary, the Bank of New England, N.A., experienced serious financial trouble in the late eighties and came under the heightened supervision of the Federal Reserve Board, which regulates bank holding companies, and the Office of the Comptroller of the Currency, which oversees the national [330 U.S.App.D.C. 353] banking system. The Comptroller began to monitor the day-to-day operations of the Bank, and new management teams, approved by the regulators, assumed leadership of the Bank and Corporation. Between 1989 and January of 1991, the Corporation transferred millions of dollars in assets to the Bank in an effort to shore it up. But the financial condition of both institutions continued to deteriorate, and on January 6, 1991, the Comptroller declared the Bank insolvent and named the FDIC as receiver. The next day, the Corporation filed for bankruptcy.
 
 
 3
 The Trustee in Bankruptcy sued the FDIC in Massachusetts federal district court to void the Corporation's transfers to the Bank as fraudulent conveyances. He claimed that the FDIC, acting in concert with the Board and the Comptroller, realized that the Corporation and the Bank were already insolvent and pressured the Corporation's management to downstream assets to the Bank to reduce the losses that the FDIC would incur as receiver. To support his allegations, he offered evidence like the following statement that the Comptroller of the Currency gave to Congress in defense of his decision not to close the Bank sooner:
 
 
 4
 [T]he loss to the FDIC did not increase, and may well have been reduced, due to the efforts of the new management team. These efforts included the sale of Corporation assets and the downstreaming of the sale proceeds to the Bank. Had the Bank been closed earlier, these assets would have been left behind in the holding company and would not have been available to reduce the FDIC's ultimate cost.
 
 
 5
 The Failure of the Bank of New England: Hearings Before the Senate Comm. on Banking, Hous., and Urban Affairs, 102d Cong. 11 (1991) (statement of Robert L. Clarke, Comptroller, Office of the Comptroller of the Currency). The Trustee's theory required him to show either that the transfers were made "with actual intent to hinder, delay, or defraud" the Corporation's creditors or that the Corporation was insolvent when the transfers were made and did not receive fair consideration in return for them. 11 U.S.C. § 548(a) (1994). If the transfers were voidable under § 548, the Trustee could recover them from the entity for whose benefit they were made. 11 U.S.C. § 550(a)(1) (1994). The FDIC moved to dismiss the suit on the ground that it was not an "entity" under the Code because of its role as regulator and insurer of banks and that, in any event, a reduction in its handling costs was not the sort of "benefit" contemplated by § 550. The district court, finding the FDIC subject to suit under § 550, denied the motion. Branch v. FDIC, 825 F.Supp. 384, 401-02 (D.Mass.1993).
 
 
 6
 The Trustee sent discovery requests to the FDIC and served the Board and the Comptroller with subpoenas duces tecum. All three turned over some documents, but asserted the deliberative process privilege with respect to others. The Trustee filed a motion to compel against the FDIC in Massachusetts and separate subpoena enforcement actions against the Board and Comptroller in District of Columbia district court. The Massachusetts court refused to apply the privilege to the FDIC documents. It said that, unless the FDIC could show a greater need for secrecy than the generalized "chilling effect" of disclosure, the privilege must give way in a case that turned on the government's intent.
 
 
 7
 Our district court, ruling subsequently, thought that the privilege could be overcome only if the Trustee introduced evidence of government "misconduct" or if he satisfied a five factor balancing test showing a superior interest in the documents. The court said that the misconduct exception only applied when a plaintiff alleged that the agency's decisionmaking process had been tainted by misconduct. Since the Trustee "attacks the goals of the regulators' policies, to downstream assets, and not the deliberative system from which these goals arose," it held the misconduct bar inapplicable. As to the five factor balancing test, the court relied on the analysis we articulated in Schreiber v. Society for Sav. Bancorp, Inc., 11 F.3d 217 (D.C.Cir.1993). There, we said that the bank examination privilege, a close cousin of the deliberative process privilege, could be overcome on a showing of good cause, as determined by the following considerations:[330 U.S.App.D.C. 354] (i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the 'seriousness' of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable.
 
 
 8
 Schreiber, 11 F.3d at 220-21 (citations omitted). The district court appeared to apply only the second, third, and fourth factors. It said that the underlying litigation was not "serious" because there was no evidence showing that either the Board or the Comptroller had engaged in "misconduct." And since neither were named defendants in the underlying suit, the court thought their role minimal. Finally, it emphasized that the Trustee would not suffer much harm if he could not reach these documents, because all three agencies had already supplied him with a multitude of materials.
 
 II.
 
 9
 Appellant's primary argument is that the common law deliberative process privilege is not appropriately asserted--as the district court in Massachusetts appeared to recognize--when a plaintiff's cause of action turns on the government's intent. We agree. The privilege was fashioned in cases where the governmental decisionmaking process is collateral to the plaintiff's suit. See, e.g., In re Subpoena Served Upon the Comptroller of the Currency, 967 F.2d 630 (D.C.Cir.1992) (shareholders sought Comptroller's bank examination reports to prove fraud charges against corporation); Singer Sewing Machine Co. v. NLRB, 329 F.2d 200 (4th Cir.1964) (petitioner wanted deliberative materials to establish a defense to an unfair labor practice charge). If the plaintiff's cause of action is directed at the government's intent, however, it makes no sense to permit the government to use the privilege as a shield. For instance, it seems rather obvious to us that the privilege has no place in a Title VII action[1] or in a constitutional claim for discrimination. See Crawford-El v. Britton, --- U.S. ----, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); Webster v. Doe, 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988). The Supreme Court struggled in Crawford-El and Webster with governmental claims that discovery in such a proceeding should be limited, but no one in any of these cases ever had the temerity to suggest that the privilege applied. The argument is absent in these cases because if either the Constitution or a statute makes the nature of governmental officials' deliberations the issue, the privilege is a nonsequitur. The central purpose of the privilege is to foster government decisionmaking by protecting it from the chill of potential disclosure. See NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 150, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975). If Congress creates a cause of action that deliberatively exposes government decisionmaking to the light, the privilege's raison d'etre evaporates.
 
 
 10
 The government, to be sure, disputes that appellant has such a cause of action. It argues that however the Bankruptcy Act treats private parties, bank regulatory agencies are removed from its reach. The Federal Deposit Insurance Act requires the FDIC and presumably its fellow government regulators to resolve failing banks with the least possible cost to the bank insurance fund--and thus to the American taxpayer. Therefore, the argument goes, even if the Board and Comptroller had pressured the Corporation to downstream assets, they were only doing "the Lord's work." There may well be a question as to the relationship between these two federal statutes, but the Massachusetts [330 U.S.App.D.C. 355] district court has, at least preliminarily, ruled on that issue by rejecting the government's motion to dismiss the underlying litigation. We will defer to its ruling. Strictly speaking, it might not be the law of the case, because a subpoena enforcement action is technically a different "case" and the Board and the Comptroller are not named defendants in Massachusetts. The suit before us, however, is tied closely to the underlying litigation, and the Board and the Comptroller are but different government arms accused of acting in concert. As a matter of judicial comity, we leave it to the Massachusetts court to resolve the merits of the Trustee's suit.
 
 
 11
 When it rejected the misconduct exception, our district court intuitively recognized that the analysis normally governing the applicability of the deliberative process privilege does not fit this situation. It pointed out that the plaintiff was attacking the actual goals of the regulators, rather than asserting that the agency's decisionmaking process was tainted with misconduct. We think that is another way of expressing our understanding that the deliberative process privilege protects against collateral attack. But the appropriate conclusion is not that the misconduct exception does not apply, but rather that the privilege does not enter the picture at all.[2]
 
 
 12
 We therefore see no need to engage in the balancing test applied in deliberative process privilege cases. The appellant is entitled to have his subpoena enforced.
 
 
 
 [1]
 On one occasion, we speculated that the privilege would apply to a Title VII suit. American Fed'n of Gov't Employees, Local 2782 v. Department of Commerce, 907 F.2d 203, 207 (D.C.Cir.1990). In that case, however, our primary concern was the scope of Exemption 5 of the Freedom of Information Act. The appellants had argued that because the documents they sought would be "available by law" to a litigant in a Title VII suit, the government could not claim the deliberative process privilege under Exemption 5. Part of our response was that the privilege may well protect documents in Title VII litigation. But, as we recognized even in that case, this assumption is not necessary to preserving the vitality of the FOIA exemption. A litigant may not overcome Exemption 5 by reference to hypothetical litigation. See id. at 207; see also NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149 n. 16, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975); In re Sealed Case, 121 F.3d 729, 737 n. 5 (D.C.Cir.1997)
 
 
 [2]
 The word "misconduct" does not even really fit this situation, because the government could have violated the Bankruptcy Code without the nefarious motives that the word "misconduct" implies. Section 548 of the Bankruptcy Code requires a showing of the government's intent, but it does not require a showing that the government acted in bad faith. See In re Checkmate Stereo & Elecs., Ltd., 9 B.R. 585, 613 (Bankr.E.D.N.Y.1981) ("A plan to appropriate the assets of an insolvent debtor, while holding the debtor's creditors at bay, is in fraud of creditors .... even if done in the greatest good faith.")