IN RE: UNITED STATES, Petitioner

Fairholme Funds, Inc., The Fairholme Fund, Acadia Insurance Company, Admiral Indemnity Company, Admiral Insurance Company, Berkley Insurance Company, Berkley Regional Insurance Company, Carolina Casualty Insurance Company, Continental Western Insurance Company, Midwest Employers Casualty Insurance Company, Nautilus Insurance Company, Preferred Employers Insurance Company, Plaintiffs–appellees

v.

United States, Defendant–appellant

2017-104
2017-1122

United States Court of Appeals, Federal Circuit.

January 30, 2017

Gerard Sinzdak, Attorney, Abby Christine Wright, Attorney, Department of Justice, Appellate Staff, Civil Division, Washington, DC, for United States (Case Nos. 2017–104, 2017–1122).

Mark B. Stern, Department of Justice, Appellate Staff, Civil Division, Washington, DC, for Petitioner (Case No. 2017–104).

Charles J. Cooper, Brian W. Barnes, Vincent J. Colatriano, Howard C. Nielson, Jr., Peter A. Patterson, David Thompson, Cooper & Kirk, PLLC, Washington, DC, for Fairholme Funds, Inc., the Fairholme Fund, Admiral Indemnity Company, Berkley Insurance Company, Berkley Regional Insurance Company, Carolina Casualty Insurance Company, Continental Western Insurance Company, Midwest Employers Casualty Insurance Company, Nautilus Insurance Company, Preferred Employers Insurance Company, Acadia Insurance Company, Admiral Insurance Company (Case Nos. 2017–104, 2017–1122).

Before Dyk, O'Malley, and Wallach, Circuit Judges.

## ORDER

O'Malley, Circuit Judge.

The United States, defendant in this takings suit, has filed an interlocutory appeal (Appeal No. 2017–1122) and a petition for a writ of mandamus (Appeal No. 2017–104). Through these filings, the government seeks to reverse an order of the United States Court of Federal Claims granting a motion to compel discovery of documents over the government's claims of privilege. *Fairholme Funds, Inc. v. United States*, 128 Fed.Cl. 410 (2016). The order was issued as part of an ongoing litigation in the Claims Court that was brought by Respondents—various preferred shareholders of the Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac")—challenging the effect of a 2012 amendment to a stock transfer agreement between the Department of the Treasury and the companies' conservator, Federal Housing Finance Agency ("FHFA"). We grant Respondents' motion to dismiss Appeal No. 2017–1122. We also conclude that the United States is entitled to a writ on a subset of the documents in question. We find insufficient grounds for a writ as to all other documents that were the subject of the discovery order, however. We grant the petition in part and direct the Claims Court to enter an order consistent with this opinion.

### BACKGROUND

Fannie Mae and Freddie Mac, both publicly chartered government sponsored enterprises (referred to herein as "the GSEs"), experienced serious financial trouble in the late 2000s. Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110–289, 122 Stat. 2654 (2008) in part as an effort to restructure the regulation of the GSEs. HERA created FHFA and gave it the statutory authority to place the GSEs into conservatorship. Thereafter, FHFA began to monitor the day-to-day operations of the GSEs, and has done so since.

HERA provided FHFA with broad governmental authority. Specifically, Congress provided that FHFA, as conservator, "immediately succeed[s] to all rights, titles, powers, and privileges of the regulated entity, and of any stockholder," 12 U.S.C. § 4617(b)(2)(A), and authorized it to "take over the assets of and operate the regulated entity with all the powers of the shareholders, the directors, and the officers of the regulated entity." § 4617(b)(2)(B)(i). Congress also authorized Treasury to "purchase any obligations and other securities issued by" Fannie Mae and Freddie Mac. 12 U.S.C. § 1455($l$)(1)(A).

In September 2008, FHFA placed Fannie Mae and Freddie Mac into conservatorship and Treasury immediately entered into Senior Preferred Purchase Agreements (PSPA) with FHFA to purchase stock. Under the Agreements, Treasury committed to provide up to $100 billion to each company to ensure that it maintained a positive net worth. In return, Treasury received $1 billion in senior preferred stock from each GSE, a 10% dividend on the amount that was invested, and a warrant to purchase 79.9% of the common stock of each GSE.

FHFA and Treasury amended the purchase agreements twice to increase the amount of funds Treasury committed to the GSEs. On August 17, 2012, the FHFA and Treasury amended the PSPAs a third time. As pertinent here, the Third Amendment eliminated the fixed dividend obligation of 10% and replaced it with a provision that required the GSEs to pay a variable dividend entitling Treasury to a quarterly payment of 100% of the GSEs' profits. This provision is referred to as the "net worth sweep" because "any increase

in net worth flowing from net income … will be swept by Treasury." Compl. at ¶ 64, *Fairholme Funds, Inc. v. United States,* No. 13–465C (Fed. Cl. July 9, 2013), ECF No. 1.

According to the government's filings in this case, the purpose of the net worth sweep was to eliminate the prospect of future insolvency caused by the originally agreed upon fixed-dividend payments. The government has explained that, by eliminating the fixed dividend and replacing it with a dividend that would be paid only if the GSEs were profitable, the net worth sweep eliminated the possibility of what it termed a "death spiral" where the GSEs would draw "on the Treasury commitment to pay Treasury its fixed dividend, which, in turn, increased Treasury's total investment and the next quarterly dividend," in a repeated cycle potentially leading to insolvency. Def's Mtn. to Dismiss at 18–19, *Fairholme Funds, Inc. v. United States,* No. 13–465C (Fed. Cl. Dec. 9, 2013), ECF No. 20.

In July 2013, Respondents filed this suit in the Claims Court alleging that they "had a reasonable investment-backed expectation that their contractual rights as preferred shareholders, including their liquidation preferences and their right to dividends, would be preserved." Compl. at ¶ 77, *Fairholme Funds, Inc. v. United States,* No. 13–465C (Fed. Cl. July 9, 2013), ECF No. 1. They allege that the net worth sweep amounted to a taking of their vested property rights without just compensation. Respondents contend that there was no threat of a "death spiral" to insolvency when the net worth sweep was crafted. Instead, Respondents contend that the GSEs were reporting substantial profits at the time which were more than sufficient both to cover Treasury's original 10% dividend guarantee and to potentially pay dividends to other preferred shareholders as

well. By making itself the sole equity holder of the GSEs, Respondents contend that Treasury appropriated the stock held by private investors, generating a massive return on investment to the government.

The government moved to dismiss the complaint on several jurisdictional grounds, including that: (1) FHFA is not the United States for purposes of Tucker Act jurisdiction; (2) Respondents lack standing under HERA to file suit; and (3) the claims are not ripe because Respondents could only speculate that the GSEs would be profitable enough to issue a dividend during conservatorship, it was unknown whether and when the GSEs would emerge from conservatorship, and the GSEs were not in liquidation. The government also argued that Respondents had failed to state a viable takings claim because they had no cognizable property interest and no reasonable investment-backed expectation given that the GSEs were already in conservatorship at the time they purchased the preferred shares.

Respondents filed a motion for a continuance to permit jurisdictional discovery under Rule 56(d) of the Rules of the Court of Federal Claims. Specifically, they sought discovery to refute the government's assertions that the claims are not ripe, that the court lacked jurisdiction, and that Respondents failed to state a claim for a regulatory taking. The Claims Court, finding that fact discovery was needed, stayed briefing. As to the government's jurisdictional arguments, the Claims Court allowed discovery on the issues of (1) the GSEs' future profitability, finding such information necessary to evaluate the government's argument that the claims should be dismissed as unripe and (2) "whether the FHFA acted at the direct behest of the Treasury" to determine whether "FHFA was an agent and arm of the Treasury" thus establishing the court's jurisdiction. Order at 3–4, *Fairholme Funds, Inc. v.*

*United States*, No. 13–465C (Fed. Cl. Feb. 26, 2014), ECF No. 32. As to the government's argument that Respondents had no reasonable investment-backed expectation because the GSEs were insolvent in 2008 when they were placed in conservatorship, the Claims Court found that discovery would help resolve disputed factual issues about "Fannie and Freddie's solvency and the reasonableness of expectations about their future profitability, as well as provide answers related to why the government allowed the preexisting capital structure and stockholders to remain in place, and whether this decision was based on the partial expectation that Fannie and Freddie would be profitable again in the future." *Id.* at 4.

FHFA and Treasury turned over approximately 48,000 documents, but refused to produce 58 documents. The government asserted the deliberative process privilege with respect to all or part of 52 of the documents, asserted the presidential communications privilege as to all or part of four documents, and asserted the bank examination privilege with respect to eleven documents. Respondents moved the Claims Court to compel production. The government answered by describing the documents in a privilege log and submitted declarations from Christopher H. Dickerson, Senior Associate Director of the Division of Enterprise Regulation at FHFA, David R. Pearl, Executive Treasury Secretary, and Nicholas L. McQuaid, Deputy White House Counsel. After reviewing the materials *in camera*, the Claims Court granted Respondents' motion with respect to the withheld documents. The government then filed an appeal and a petition for a writ of mandamus.

## DISCUSSION

### A.

We first dismiss the government's Appeal No. 2017–1122. The collateral order doctrine permits parties to appeal orders that "determine" a "disputed" and "important" issue "separate from the merits of the action," which are "effectively unreviewable" on a later appeal. *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978). The Supreme Court has expressed general disfavor for review of privilege issues under the doctrine, although, as both parties agree, it has not said expressly whether collateral order doctrine review is appropriate in cases involving governmental privileges. *See Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 113 n.4, 130 S.Ct. 599, 175 L.Ed.2d 458 (2009). Other courts of appeals have rejected such appeals, however. *See In re Cheney*, 334 F.3d 1096, 1109 (D.C. Cir. 2003) (no review of presidential communications privilege), *rev'd on other grounds*, *Cheney v. U.S. Dist. Crt. for Dist. of Col.*, 542 U.S. 367, 124 S.Ct. 2576, 159 L.Ed.2d 459 (2004).

We decline to decide the parameters of collateral order review involving privilege claims such as those at issue here. The government has not even attempted to show that the trial court's order satisfies the stringent standard for collateral review. Instead, it falls back on its petition for writ of mandamus and concedes that its request for relief from the Claims Court's order should "rise or fall with the merits of its mandamus petition." Opp'n to Pls.' Mot. to Dismiss at 3, *Fairholme Funds, Inc. v. United States*, No. 17–1122 (Fed. Cir. Dec. 1, 2016), ECF No. 16. It, thus, essentially leaves the motion to dismiss its appeal unopposed. In these circumstances, we dismiss Appeal No. 2017–1122 and turn to the government's petition for a writ of mandamus.

"Notwithstanding the extraordinary nature of [mandamus] relief, this court has

issued the writ in appropriate cases to prevent the wrongful exposure of privileged or confidential communications." *In re United States*, 669 F.3d 1333, 1336 (Fed. Cir. 2012). The Supreme Court has explained that mandamus relief may issue in the event of a "particularly injurious" or "novel privilege ruling." *Mohawk Indus.*, 558 U.S. at 110, 130 S.Ct. 599 ("[I]n extraordinary circumstances—*i.e.*, when a disclosure order amount[s] to a judicial usurpation of power or a clear abuse of discretion, or otherwise works a manifest injustice—a party may petition the court of appeals for a writ of mandamus.") (internal citations and quotation marks omitted). To be sure, mandamus relief is reserved only for unusual cases and will not typically issue in connection with discovery orders. *See In re MSTG, Inc.*, 675 F.3d 1337, 1341 (Fed. Cir. 2012). But here, the government asserts that the ruling threatens to intrude upon and interfere with the decision-making process of the President and executive agencies. We find that these concerns "remove this case from the category of ordinary discovery orders where ... review is unavailable[ ] through mandamus[.]" *Cheney*, 542 U.S. at 382, 124 S.Ct. 2576. We turn to the question of whether and to what extent mandamus relief is justified here.

### B.

In deciding whether to compel discovery in the face of asserted executive privileges,[1] the trial court is tasked with addressing, on a document-by-document basis, (1) whether the government has established that the invoked privilege applies; (2) how extensive the harm to the deliberative process would be if the documents were disclosed; and (3) whether the benefits of disclosure will, on balance,

outweigh the harms. We give the trial court's findings on such case-specific materials considerable deference, particularly where, as here, we are reviewing the court's determinations by way of mandamus. Consequently, we will reverse the trial court's discovery orders only where the court has clearly abused its discretion. *See Cheney*, 542 U.S. at 380, 124 S.Ct. 2576.

Under this standard, we do not find that the Claims Court abused its discretion with respect to most of the disclosures ordered. To begin, the government fails to offer specific objections to the Claims Court's findings on most of the documents at issue; it only offers specific arguments as to a handful of the documents that were the subject of the discovery order. Obviously, mandamus relief cannot be ordered in the absence of arguments to support it. We, thus, limit our analysis to the sixteen documents the government addresses expressly in its petition.

The government asserts the deliberative process privilege for eight documents (UST00478535, UST00384501, UST00490551, UST00389678, UST00518402, FHFA00092209, UST00389662, UST00492699), the presidential communications privilege for four documents (UST00500982, UST00521902, UST00515290, UST00550441), and the bank examination privilege as to four documents (FHFA00096631, FHFA00096634, FHFA00096636, FHFA 00096638).

Upon review of the documents at issue and the privileges asserted, we find that, with regard to a select few of the documents the government identifies, the Claims Court clearly erred in ordering disclosure. We explain our reasons for reaching this conclusion with respect to each of

---

1. We use "executive privilege" to collectively refer to the deliberative process privilege, presidential communications privilege, and bank examination privilege.

the documents we find merit mandamus relief. As to all other documents at issue, we deny the government's petition.

## C.

We first turn to those few documents where we conclude the Claims Court's disclosure order was inappropriate. We address them in relation to the nature of the privilege asserted.

### 1. Deliberative Process Privilege

To qualify for protection under the deliberative process privilege, a document must be "(1) 'predecisional,' *i.e.*, prepared in order to assist an agency decisionmaker in arriving at [a] decision, and (2) 'deliberative,' *i.e.*, actually ... related to the process by which the policies [or decisions] are formulated." *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 356 (2d Cir. 2005) (quoting *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999)); *Tigue v. Dep't of Justice*, 312 F.3d 70, 76 (2d Cir. 2002); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).

██ *a. Draft Memorandum Concerning Proposed Legislation* (UST00518402): The government seeks to preclude from discovery an internal draft memorandum prepared for the Treasury Secretary, the disclosure of which would reveal Treasury staff's subjective views on two proposed pieces of legislation concerning the wind down of the GSEs. Neither piece of legislation was ever enacted.

Having reviewed the materials, we find no basis for the Claims Court's disclosure decision. The Claims Court first rested its decision on the fact that the deliberative nature of the document was "not apparent on its face." It is well established, however, that a document is deliberative if disclosure would expose "recommendations," "suggestions," and "other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency," *Coastal States*, 617 F.2d at 866, or "expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its function," *Dudman Commc'ns Corp. v. Dep't of Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987). And courts have recognized that "[a]n internal agency communication that makes a recommendation or expresses an opinion necessarily reflects the give-and-take of the agency's deliberative process." *Am. Fed'n of Gov't Employees, Local 2782 v. U.S. Dep't of Commerce*, 907 F.2d 203, 208 (D.C. Cir. 1990).

This is, moreover, the type of material that, if released, "is likely in the future to stifle honest and frank communication within the agency." *Coastal States*, 617 F.2d at 866. The document is "recommendatory in nature." *Id.* It further contains candid discussions and subjective views on the pros and cons of each piece of legislation. This is what the deliberative process privilege was designed to protect. We agree with the government that, if Treasury staff knew their views on the legislation could be made available, they would be less likely to express those views in the future.

The Claims Court alternatively found that its order was unlikely to chill future communications within Treasury because the court entered a protective order limiting the use and further disclosure of the documents. We cannot say, however, that this would negate the significance of ordering disclosure of such materials. The critical inquiry is whether protection of the materials would promote better policymaking by encouraging candor in internal deliberations. Because the existence of a pro-

tective order that limits dissemination of the material can "ameliorate but cannot eliminate these threatened harms," *Perry v. Schwarzenegger*, 591 F.3d 1147, 1164 (9th Cir. 2009), the Claims Court clearly erred in not weighing this factor more heavily against disclosure.

The Claims Court finally found that "there is no other source of evidence available to plaintiffs that would similarly inform their understanding of the [GSE]s' future profitability, the reasonableness of plaintiffs' expectations regarding the [GSE]s' future profitability, the lifespan of the conservatorships, and the relationship between the FHFA and the Treasury Department." *Fairholme Funds*, 128 Fed.Cl. at 458. But this finding has no basis in the record. The proposed bills and staff memorandum have no connection to the Third Amendment that is the subject of this litigation, and the information contained therein is available from other sources.

*b. Draft Policy Memoranda* (UST00389678 and UST00490551): The Claims Court evidently felt that UST00490551 could not be predecisional because the document was "undated." But the fact that the document was not dated is not determinative of whether the government was able to provide a sufficient basis for invoking the privilege. *See Rein v. U.S. Patent & Trademark Office*, 553 F.3d 353, 366 n.21 (4th Cir. 2009); *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006) ("Dates are but one way to illustrate a chronology, and the FDA may have other ways to prove that the undated documents were indeed predecisional.").

Here, the government submitted a declaration explaining that these documents were prepared for internal use by Treasury in addressing a specific issue facing the agency: establishing a strategy for reforming the mortgage finance system. The declaration accurately explains that the documents include a draft memo for the Treasury Secretary outlining housing market reform proposals (UST00389678) and a policy paper discussing potential comprehensive housing reform efforts (UST00490551).

We have recognized that a party seeking information "must make a strong showing of need" to breach executive privilege and that the information sought must be central to the case. *Zenith Radio Corp. v. United States*, 764 F.2d 1577, 1580 (Fed. Cir. 1985). Here, however, only one of the documents (UST00389678) actually discusses the net worth sweep provision central to this case, and that document gives no insight into the motivations behind the provision.

The Claims Court justified disclosure on grounds that the documents could relate to the GSEs' future profitability and on the reasonableness of Respondents' expectations regarding the GSEs' future profitability and the intended lifespan of the conservatorships. We agree with the government that these matters are too "remote from the central legal issue in the case" and that "their probative value is too weak to justify breaching the important privileges the government asserted in declining to produce the information." *Id.* at 1580–81. The documents reveal little about the government's plans concerning ending conservatorship or the profitability picture of the GSEs that could shed light on whether these claims are ripe for review that cannot also be obtained from other materials. Even assuming that these non-public internal government documents could be relevant to whether the investors' expectations were objectively reasonable, *Cienega Gardens v. United States*, 331 F.3d 1319, 1346 (Fed. Cir. 2003), they provide no actual insight into the profitability picture of the GSEs at the time of the amendments or materially relevant infor-

mation concerning whether Respondents had a reasonable investment-backed expectation. There is simply an insufficient basis upon which to conclude that the assertion of privilege has been overcome as to these documents.

*c. FHFA Presentation on Deferred Tax Assets* (FHFA00092209): The government seeks to preclude from discovery an internal FHFA presentation concerning the treatment of deferred tax assets. The Claims Court found that the government had not shown that the document was deliberative and that, in any event, the privilege should not shield relevant evidence in the case. The government asserts generally that the Claims Court's decision reflects a clear misunderstanding both of the deliberative process privilege and the document itself.

 We agree with the government. The Claims Court's decision is inconsistent with well-established principles of how to apply the deliberative process privilege. The presentation is clearly a "recommendation to a supervisor" on how to go about making a determination as to whether a deferred tax asset of the GSEs could be realized and as such constitutes "a classic example of a deliberative document." *Abtew v. U.S. Dep't of Homeland Sec.*, 808 F.3d 895, 899 (D.C. Cir. 2015).

The declaration the government submitted to the Claims Court accurately describes the material as a partially redacted presentation by FHFA's Office of the Chief Accountant in October 2008. The document reveals deliberations over the measurement and treatment of the GSEs' deferred tax assets and subjective arguments for and against the realization of these assets based on information that FHFA requested and obtained from the

GSEs. The declaration explains that the document was prepared as part of the process of FHFA's supervision over the GSEs and does not indicate it was ever considered in deciding whether to revise the stock agreement.[2]

Respondents claim that "documents bearing on FHFA's assessment of the [GSEs]' deferred tax assets and financial outlook near the beginning of the conservatorships ... are critical to this case." Resp. at 51. Because information pertaining to why the GSEs realized tax losses in 2008, as well as why they reversed course in 2012, is available to Respondents in public filings, there is no sufficient showing of need.

Respondents suggest that "the decision to zero out Fannie's and Freddie's deferred tax assets and other assets caused the bulk of the [GSEs]' paper losses during the early years of conservatorship" and then to release "the deferred tax asset reserves shortly after the Net Worth Sweep was imposed" is evidence that FHFA presumably envisioned valuation would later be reversed and the government would receive a windfall. *Id.* at 51–52. But the fact that some FHFA employees were able to come up with reasons for and against realization in 2008 to help assist their supervisor's decision is hardly probative evidence of such motive. "The purpose of [the deliberative process] privilege is to allow agencies to freely explore possibilities, engage in internal debates, or play devil's advocate without fear of public scrutiny." *Moye, O'Brien, O'Rourke, Hogan, & Pickert v. Nat'l R.R. Passenger Corp.*, 376 F.3d 1270, 1277 (11th Cir. 2004). The privilege would be meaningless if all a litigant had to do was raise a question of intent to warrant disclosure.

---

**2.** Although the privilege log failed to identify the affiliations of all the individuals listed, it is clear from the document itself that FHFA employees created it.

Finally, the Claims Court found that the privilege "cannot shield the disclosure of the document in this instance because evidence relating to the [GSEs'] future profitability implicates both the court's jurisdiction and the merits of the case and therefore is discoverable." *Fairholme Funds*, 128 Fed.Cl. at 445. Here again, we find that the relevance of how some FHFA staff saw the arguments for and against realization of deferred tax assets too remote from the central issues in the case and its probative value too weak to warrant disclosure.

2. Presidential Communications Privilege

The government seeks protection of four documents (UST00500982, UST00521902, UST00515290, and UST00550441) under the presidential communications privilege, and also asserts the deliberative process privilege as to three of them. Because we find that the presidential communications privilege bars disclosure, we need not address whether they are also protected under the deliberative process privilege. *See In re Sealed Case*, 121 F.3d 729, 746 (D.C. Cir. 1997).

The presidential communications privilege is rooted in the notion that "[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *United States v. Nixon*, 418 U.S. 683, 708, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). Accordingly, the privilege extends to "communications made by presidential advisers in the course of preparing advice for the President" and "communications authored or solicited and received by those members of an immediate White House adviser's staff who have broad and significant responsibility for investigating and formulating the advice to be given the Presi-

dent." *Sealed Case*, 121 F.3d at 752. The Claims Court found that the individuals in question here qualify for the privilege, but ultimately concluded that Respondents established a need for the documents at issue.

If the President invokes the privilege when asked to produce documents or other materials that reflect decisionmaking and deliberations that the President believes should remain confidential, the documents are deemed "presumptively privileged." *Id.* at 744. The privilege may be "overcome by an adequate showing of need." *Id.* at 745. That showing is "more difficult to surmount" than the deliberative process privilege, *id.* at 746: a party seeking to overcome the privilege must provide a "focused demonstration of need," *id.* and may overcome the privilege only upon a showing that each discrete group of the materials likely contains "important evidence"—evidence "directly relevant to issues that are expected to be central to the trial"—and that this evidence is not available with due diligence elsewhere, *id.* at 754.

■ Under this framework, there is no basis to warrant disclosure. The justifications offered for a contrary holding are unpersuasive. The Claims Court found the privilege in doubt because it could not independently verify the actual author or recipient of UST00500982 and UST00521902 from the face of the documents and because it could not ascertain the title of a Treasury employee on the email communications in UST00515290. But these are insufficient reasons to rebut the presumption. The declaration submitted by the Deputy White House Counsel on behalf of the President stated that UST00500982 and UST00521902 were in fact sent by senior White House advisors. His declaration does not state the title of the Treasury employee in the email exchange in UST00515290. But that fact is

irrelevant to whether the presidential communications privilege applies, as it is undisputed that the senior White House advisor on the email was investigating and forming a basis for providing advice on the matters at issue.

Respondents submit that the government failed to properly invoke the presidential communications privilege because the Deputy White House Counsel invoked it on behalf of the President. In particular, Respondents call the court's attention to prior cases in which the President was the one to invoke the privilege. But the fact that the President himself invoked the privilege in those cases does not mean that he cannot delegate the act of invocation to others, and Respondents cite no appellate court case to the contrary. Nor do we find any reason for requiring such a rule in a civil case in which the materials were not necessarily viewed by the President.

Finally, even if disclosure would be appropriate in response to an assertion of the deliberative process doctrine, the Claims Court clearly failed to apply the heightened standard necessary for disclosure under the presidential communications privilege. Under such heightened scrutiny, no particular need has been shown. Three of the four documents do not mention the PSPAs, the relationship between FHFA and Treasury, the possibility of a Third Amendment, or the lifespan of the conservatorship. And the remaining document (UST00521902) provides no insight into FHFA's intent or the expected length of the conservatorship. Having reviewed these materials, it is clear that such information is already available to Respondents or will be available given our decision to leave the bulk of the disclosure order undisturbed.

### D.

We now turn to the documents as to which we find no right to mandamus relief.

Again, we discuss them by reference to the privilege asserted.

#### 1. Bank Examination Privilege

 The government urges that the bank examination privilege protects from disclosure four risk assessment memoranda prepared by the Office of the Financial Analysis, Modeling, and Simulations Group within FHFA (FHFA00096631, FHFA00096634, FHFA00096636, and FHFA 00096638). The Claims Court concluded that the documents were subject to the privilege, but found that Respondents' need for the documents outweighed the government's interest in their confidentiality.

As the Claims Court and the parties correctly note, this court has not had occasion to address or expressly recognize the bank examination privilege. Other courts have explained that the privilege "arises out of the practical need for openness and honesty between bank examiners and the banks they regulate, and is intended to protect the integrity of the regulatory process by privileging such communications." *Wultz v. Bank of China Ltd.*, 61 F.Supp.3d 272, 281–82 (S.D.N.Y. 2013). It is designed to protect "communications between banks and their examiners in order to preserve absolute candor essential to the effective supervision of banks." *Id.* at 282. In other words, the privilege recognizes that bank regulation "depends vitally upon the quality of communication between the regulated banking firm and the bank regulatory agency." *In re Subpoena Served Upon Comptroller of Currency*, 967 F.2d 630, 633 (D.C. Cir. 1992).

The government submits that the documents at issue are internal FHFA documents discussing the GSEs' earnings and solvency. According to the government: (1) assessing solvency and soundness of a fi-

nancial institution is a classic bank examiner function; and (2) the analysis of the bank examiner and the information provided to the examiner by the financial institution is precisely the type of information the privilege was designed to protect. Even if we were to assume the bank examination privilege applies in these circumstances, the privilege may be "overridden for good cause." *Id.* at 634.

Here, the Claims Court considered all of the factors relevant to a good cause analysis, finding that the evidence was relevant to future profitability and solvency and was not available from other sources, and that the seriousness of the litigation and the government's role in this litigation favored disclosure. After balancing the relevant factors, the Claims Court concluded that Respondents had demonstrated good cause to override the privilege. We decline to disturb that finding on mandamus review. *See In re Queen's Univ. at Kingston*, 820 F.3d 1287, 1291 (Fed. Cir. 2016) ("[A] writ of mandamus may be granted to overturn a district court order 'only when there has been a clear abuse of discretion or usurpation of judicial authority' ").

### 2. Deliberative Process Privilege

The government asserts that the remainder of the documents discussed in its petition are protected by the deliberative process privilege. Upon review, however, the deliberative nature of those documents has not been established with sufficient clarity to justify the conclusion that the Claims Court abused its discretion in ordering their disclosure.

■ For instance, we cannot say that the draft speech (UST00492699) is clearly and indisputably deliberative. The government submitted a declaration describing this document as a draft speech to be delivered by the Counselor to the Treasury Secretary for Housing Finance Policy regarding housing policy reforms. According to the declaration, this document reflects discussions of ongoing policy efforts, including standards for short sales, the federal risk retention rule, and housing finance reform. We have examined the draft speech and it does not clearly show any "predecisional deliberations" on these issues as claimed. The draft speech, which is clearly aimed at a public audience, does not contain any subjective recommendations or the like about agency policy for the purpose of internal agency decision-making on substantive policy matters that the doctrine is designed to protect. We therefore cannot say that the Claims Court clearly abused its discretion in ordering disclosure.

■ The question of the deliberative nature of UST00478535 and UST00384501, documents concerning how best to publicly announce the PSPA amendment news, is, admittedly, a closer one. As the government notes, the documents do contain staff "pros and cons," but they do so only with respect to providing options for how to announce the revisions. On the one hand, this is deliberative in the sense of taking a position on how to present agency decisions to Congress, the press, or the public. On the other hand, it may be that the deliberations are not actually the type of substantive policy decisions that the privilege was intended to enhance through frank discussion. In any event, the government did not claim that the discussion of the timing of the announcement was a ground for a deliberative process privilege. Under such circumstances, we decline to second-guess the Claims Court's finding that the government has not shown that these documents are protected by the privilege.

■ Next, the government argues that the Claims Court erred in ordering the

production of UST00389662, an internal Treasury memorandum from the Assistant Secretary for Financial Markets to the Treasury Secretary concerning potential GSE restructuring and transition options. The government submitted a declaration stating that this document contained discussions of various policy options under consideration and reflects predecisional deliberations regarding those options. The Claims Court found that the privilege could not shield the document from disclosure because the evidence was relevant to both the merits and jurisdictional issues in the case, including the GSEs' future profitability, and contained information that was not available from other sources. Having reviewed the materials, we are not prepared to say that the Claims Court's disclosure ruling was a clear abuse of discretion.

Accordingly,

It Is Ordered That:

(1) The motion to dismiss Appeal No. 2017–1122 is granted. Each side shall bear its own costs.

(2) The petition for a writ of mandamus is granted to the extent that the Claims Court is directed to vacate the portions of its order directing the government to disclose FHFA00092209, UST00518402, UST00389678, UST00490551, UST00500982, UST00521902, UST00515290, and UST00550441. The petition is otherwise denied.